# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMARO TAYLOR, | ) |
| *Plaintiff*, | ) |
| v. | ) No. 16 C 4656 |
| KEVIN DOCHERTY, | ) Judge Virginia M. Kendall |
| RALPH PALOMINO, | ) |
| *Defendants*. | ) |

## MEMORANDUM ORDER AND OPINION

Chicago Police Department ("CPD") Officer Ralph Palomino arrested Jamaro Taylor on May 8, 2014 on charges that he sexually assaulted Rebecca Pinnex in 2011. After Taylor spent approximately three years in custody, the Cook County State's Attorney dismissed the charges against him in 2017. Taylor now brings this lawsuit, in which he alleges that: (1) Officer Kevin Docherty ordered Taylor's arrest without probable cause, in violation of the Fourth Amendment, (2) Officer Ralph Palomino ordered an unlawful draw of Taylor's blood, also in violation of the Fourth Amendment, and (3) Officers Docherty and Palomino ("Defendants") maliciously prosecuted him in violation of Illinois law. Defendants now move for summary judgment on all counts. For the reasons set forth below, the Motion for Summary Judgment (Dkt. 106) is granted.

## BACKGROUND

In May of 2011, Jamaro Taylor worked as a barber and manager at L&M Barbershop located at 422 East 87th Street in Chicago, Illinois. (Dkt. 124 ¶ 7.)[1] Taylor went by the nickname

---

[1] Taylor objects to many of the facts described in this section primarily on the grounds that statements that Docherty reports that Pinnex made to him constitute inadmissible hearsay. But Pinnex's statements are not offered for the truth of the matter asserted; rather, Defendants offer these statements for the purpose of determining whether Officer Docherty had probable cause to arrest Taylor. The probable cause inquiry "turns on whether a reasonable person in the officer's position would have probable cause to believe that an offense has been committed." *Woods v. City of*

1

"J-Ro" in the cosmetology industry. (*Id.* ¶ 8.) On May 19, 2011, sometime around noon, Taylor encountered Rebecca Pinnex outside the barber shop and gave her his business card. (*Id.* ¶ 10.) Later that same day, Pinnex called Taylor at the phone number listed on his business card and suggested that the two meet later that evening. (*Id.* ¶ 11.) Taylor drove to Pinnex's home later that day, picked her up, and drove her to a nearby liquor store where they purchased tequila. (*Id.* ¶¶ 36, 46–47.) They then drove to Calumet Beach where they drank tequila together. (Dkt. 107-2 at p. 15.) Later, they drove back to Pinnex's home. (Dkt. 124 ¶ 36.) At this point, Officer Docherty explains that the stories that Taylor and Pinnex told him in his interviews of them began to diverge.

### A. Pinnex's Version of Events According to Docherty

According to Docherty, Pinnex recounted the following information to him over the course of multiple meetings with him.

When Taylor drove back to Pinnex's home from the beach with Pinnex, he parked in front of Pinnex's home, at which point they proceeded to drink more tequila. (*Id.* ¶ 37.) At some point, Pinnex began to feel drunk and proceeded to exit the car and walk toward her home. (*Id.*) Taylor then followed her toward her home, pushed her down on the staircase to her front door, took her keys, unlocked her dock, carried her inside, and closed the door. (*Id.* ¶ 38.) Taylor then threw her on a chair and got on top of her, which caused the chair to break. (*Id.* ¶ 39.) Pinnex then got up and tried to get away from Taylor, but he followed her and pushed her onto the bed in her bedroom. (*Id.* ¶ 40.) Pinnex repeatedly told Taylor "no," but he covered her face with clothing, pulled down her leggings, and forced his penis into her vagina. (*Id.* ¶ 41.) When Taylor was finished having intercourse with Pinnex, he left her home. (*Id.* ¶ 42.) The following morning, Pinnex went to the

---

*Chi.*, 234 F.3d 979, 987 (7th Cir. 2000). "Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth that matters." *Kelly v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998). Because Pinnex's statements are offered for the purposes of eliciting what they knew about the alleged crime, not for the truth of the statements, the Court considers them for purposes of this Motion.

South Chicago Neighborhood Health Center and reported to a nurse that she had been sexually assaulted. (*Id.* ¶ 43.) The nurse called the police, and Pinnex made a police report. (*Id.*)

### B. Taylor's Version of Events According to Docherty

According to Docherty, Taylor recounted the following information to him in a July 22, 2011 interrogation while he was under arrest at the police station at 727 East 111th Street. Taylor disputes that he recounted most of these facts.

When Taylor drove back to Pinnex's home from the beach, they entered her home together. (*Id.* ¶ 48.)[2] Taylor then requested that Pinnex audition so that he could promote her as a stripper. (*Id.*)[3] Pinnex proceeded to take off her clothes and perform. (*Id.*) Pinnex then performed oral sex on Taylor, and he wore a condom. (*Id.* ¶ 49.)[4] Taylor told Docherty that he did not have vaginal intercourse with Pinnex. (*Id.* ¶ 50.)

### C. The Investigation

On May 20, 2011, Pinnex met with CPD Officer David Olson and reported to him that she had been sexually assaulted at her home the day before. (*Id.* ¶ 13.) Pinnex reported to Olson that the person who raped her went by the nickname "J-Ro." (*Id.* ¶ 17.)[5] Olson took Pinnex to Trinity Hospital where a criminal sexual assault kit was collected from her. (*Id.* ¶ 18.) CPD Evidence Technician Yvonne Carey collected the sexual assault evidence collection kit from Trinity Hospital on May 20, 2011 and inventoried it under the number 12319714. (*Id.* ¶ 22.) On May 26,

---

[2] Taylor disputes that he told Docherty that he entered Pinnex's home. (Dkt. 124 ¶ 48.)
[3] Taylor disputes that he told Docherty that he asked Pinnex to audition. (Dkt. 124 ¶ 48.)
[4] Taylor admits that Pinnex performed oral sex and that he wore a condom, but he states that he told Docherty that the oral sex occurred in a car at the beach, not at Pinnex's home. (Dkt. 124 ¶ 49.)
[5] Taylor notes that some of the facts that Pinnex recounted to Officer Olson on May 20, 2011 differ from the facts she later recounted to Officer Docherty on July 21, 2011. According to Officer Olson's Case Report from May 20, 2011, Pinnex told him that Pinnex and Taylor purchased liquor and then went to Pinnex's residence. Pinnex also indicated to Olson that they had a couple of drinks at her home, and that Taylor pulled up her pants before she relocated to another room to put on another pair of pants when Taylor assaulted her. (Dkt. 123 ¶ 4.)

2011, Docherty requested that the sexual assault evidence collection kit be submitted to the Illinois State Police Forensic Science Center for DNA analysis. (*Id.* ¶ 23.)

On July 21, 2011, Docherty and Pinnex met near the L&M Barbershop where Pinnex believed J-Ro worked. (*Id.* ¶ 29.) Pinnex identified a car parked near the barbershop as the car "J-Ro" drove on the night that he sexually assaulted her. (*Id.*) Docherty and Pinnex entered the barbershop, at which point Pinnex identified Taylor as her assailant by yelling out "you tore my stitches, you rapist." (*Id.* ¶ 30.) CPD officers then placed Taylor under arrest. (*Id.* ¶ 32.)

Docherty interviewed Pinnex on July 21, 2011 and Taylor on July 22, 2011. (*Id.* ¶¶ 28, 44.) Following Docherty's interview of Taylor, CPD Evidence Technician Kelly Comisky took a buccal swab from Taylor's cheek.[6] (*Id.* ¶¶ 51–52.) The swab was inventoried under number 12372849 and sent to the Illinois State Police Forensic Science Center for testing and analysis. (*Id.* ¶ 52.)

Also on July 22, 2011, Assistant State's Attorney Holly Kremin reviewed the evidence of criminal sexual assault and continued the investigation pending results from the sexual assault test kit and the buccal swab. (*Id.* ¶ 54.) Taylor was released from custody without being charged on July 22, 2011. (*Id.*)

Between January and March 2014, Lynette Wilson, a forensic scientist with the Illinois State Police Forensic Science Center conducted a DNA analysis of the sexual assault evidence kit and the buccal swab. (Dkt. 124 ¶ 60.) Wilson identified a DNA profile match between male DNA collected from the sexual assault kit vaginal swabs and the buccal swab taken from Taylor's mouth. (*Id.* ¶ 61.) Wilson performed a statistical analysis and determined that the DNA profile found in the vaginal swabs would be expected to match the DNA profile of approximately one in 590

---

[6] The parties dispute whether the buccal swab was taken consensually. (Dkt. 124 ¶ 51.)

quintillion unrelated black individuals, one in ten sextillion unrelated white individuals, and one in five sextillion unrelated Hispanic individuals. (*Id.* ¶ 62.) Wilson documented her findings in a March 20, 2014 report. (*Id.* ¶ 63.)

### D. Taylor's Arrest

On May 8, 2014, Docherty issued an investigative alert for the arrest of Jamaro Taylor. (*Id.* ¶ 65.) The alert indicated that Taylor was a DNA profile match in a criminal sexual assault investigation. (*Id.*) At 9:39 AM that same day, Defendant Palomino arrested Taylor pursuant to the investigative alert. (*Id.* ¶ 67.) Docherty drafted and filed a complaint for criminal sexual assault against Taylor based on Pinnex's statements to investigators, Pinnex's in-person identification of Taylor as her assailant, Taylor's statements to investigators, and the DNA results from the Illinois State Police Forensic Science Center. (*Id.* ¶ 73.) Also on May 8, 2014, the Cook County State's Attorney's Office approved the charge of Criminal Sexual Assault against Taylor for the alleged sexual assault of Pinnex on May 20, 2011. (*Id.* ¶ 69.)

After being arrested on May 8, 2014, Palomino accompanied Taylor to Trinity Hospital to receive treatment for a boil that needed to be lanced. (*Id.* ¶ 70.) In Taylor's deposition in the instant case, he testified that while he was in the hospital bed, he was handcuffed to a hospital bed and CPD officers instructed the nurse to draw his blood. (Dkt. 130 ¶ 19.) The officers who Taylor alleges ordered the blood draw were Officer Dell and "a black officer." (Dkt. 123-1 at p. 30.) Palomino provided an affidavit to this Court in which he indicates that he did not order staff to restrain Taylor or to take his blood. (Dkt. 107-8 at p. 3.)

### E. Dismissal of Charges

Taylor remained in jail until May 10, 2017, when prosecutors dismissed the charges against him on day 108 of the 120-day speedy trial term. (Dkt. 130 ¶ 21; Dkt 124 ¶ 76.) At the time

prosecutors dismissed the charges, they had been unable to locate, contact, or effect service of process on Pinnex. (*Id.* ¶ 77.)

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the Court must draw all reasonable inferences in favor of the party opposing the motion. *Anderson,* 477 U.S. at 255; *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018). However, "'inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion.'" *Herzog v. Graphic Packaging Intern., Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)).

**DISCUSSION**

A.  **Count II: Lack of Probable Cause for Arrest**

Taylor brings a Fourth Amendment claim against Docherty in which he alleges that Docherty ordered Taylor's false arrest by issuing the investigative alert on May 8, 2014 without probable cause.

A seizure is reasonable under the Fourth Amendment if it based on probable cause. *Bailey v. United* States, 568 U.S. 186, 192 (2013). Probable cause for an arrest exists where the totality of the facts and circumstances known to the officer at the time of arrest "would warrant a

reasonable, prudent person in believing that the arrestee had committed . . . a crime." *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) ((quoting *Abbott v. Sangamon Cty.*, 705 F.3d 706, 714 (7th Cir. 2013)). "'So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest . . . ." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (quoting *Jenkins v. Keating,* 147 F.3d 577, 585 (7th Cir.1998)).

In the instant case, Docherty relied on multiple pieces of information from which he inferred that he had probable cause to arrest Taylor for the sexual assault of Rebecca Pinnex. First, Pinnex reported that a man named "J-Ro" who worked at L&M Barbershop sexually assaulted her. Second, Pinnex physically identified Taylor as the individual who sexually assaulted her. Third, the DNA sample taken from Pinnex's rape kit matched the DNA taken from Taylor's buccal swab. Taylor argues that the evidence before Docherty did not give rise to probable cause because Pinnex's explanation of the events of May 19, 2011 differed somewhat between her May 20, 2011 interview with Officer Olson and her July 21, 2011 interview with Officer Docherty. That Pinnex's telling of the facts was not always precisely the same could have given Docherty pause that he did not have probable cause to arrest.[7] However, once he received the DNA results back from the Illinois State Police Forensic Science Center indicating a match, Docherty clearly had enough evidence before him to justify arresting Taylor. He had physical evidence of sexual assault as well as statements from a reasonably credible victim describing the sexual assault and identifying the perpetrator. This is sufficient evidence to give rise to probable cause. No reasonable jury could conclude, given the facts and circumstances known to Officer Docherty when he issued the

---

[7] The Court doubts, however, that the differences between Pinnex's explanation of the facts in those two interviews would give rise to any suspicion that Pinnex was an unreliable victim-witness. The fact that Pinnex's chronology about when they went to beach or when Taylor removed her pants may have changed slightly does not necessarily make her account less credible.

7

investigative alert, that it was unreasonable or imprudent of him to believe that Taylor had sexually assaulted Pinnex. In other words, no reasonable jury could find an absence of probable cause. Accordingly, Docherty is entitled to judgment as a matter of law as to Count II.

### B. Count III: Illegal Search Claim

Count III of Taylor's Second Amended Complaint alleges that Palomino and a John Doe CPD officers ordered—in violation of Taylor's Fourth Amendment right against unreasonable seizures—a Trinity Hospital nurse to draw his blood. (Dkt. 41 ¶¶ 24–26, 48–53.) Taylor does not address this claim at all in his brief in response to the instant motion. The only evidence in the record regarding the alleged blood draw comes from Taylor's deposition in which he explained that Officer Dell and an unknown black officer restrained him and ordered his blood drawn. Taylor did not bring a claim against Officer Dell. There is no evidence in the record indicating Palomino's involvement in the alleged blood draw; Taylor did not even suggest that Palomino was involved in the blood draw during his deposition. To the extent he wished to pursue a claim against the John Doe officer, Taylor has waived that claim by failing to respond to Defendants' argument that summary judgment should be entered in their favor. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) (explaining that a claim that the plaintiff failed to delineate in his brief in opposition to summary judgment is abandoned). Moreover, this claim is so lacking in factual development that no reasonable jury could conclude that an unknown defendant ordered an unlawful blood draw. For example, the record is devoid of any medical records describing the blood draw, or any explanation as to the purpose of the blood draw, or any reference to using a blood analysis for purposes of investigating the sexual assault allegations. Given the dearth of evidence before the Court, Palomino and the John Doe (to the extent that the John Doe remains a part of this case) are entitled to judgment as a matter of law as to Count III.

### C. Count I: Malicious Prosecution

Taylor's first count alleges wrongful prosecution by Docherty in violation of Illinois law. Because the Court is granting judgment as a matter of law as to the federal claims in Counts II and III, the Court now lacks supplemental jurisdiction over this state law claim.

To the extent that Taylor intended to bring a malicious prosecution claim under 42 U.S.C. § 1983,[8] the Court notes that "'[t]here is no such thing as a constitutional right not to be prosecuted without probable cause;'" there is only a constitutional right not to be held in custody without probable cause. *Manuel v. City of Joliet, Ill.*, 903 F.3d 667 (7th Cir. 2018) (quoting *Serino v. Hensley*, 903 F.3d 588, 593 (7th Cir. 2013). Thus, if Taylor did intend to bring a federal claim in Count I, the claim would actually be that he was detained without probable cause, which is the claim the Court already dispensed with in Count II.

Regardless of whether Taylor styles this malicious prosecution claim as a federal or state law claim, Docherty is entitled to judgment as a matter of law.

---

[8] The Second Amended Complaint suggests that Taylor brings the malicious prosecution claim under both federal and state law. (*See* Dkt. 41 ¶ 32.)

**CONCLUSION**

Plaintiff Jamaro Taylor has failed to satisfy his burden to demonstrate that a reasonable jury could conclude that Defendant Kevin Docherty lacked probable cause to arrest him on sexual assault charges. Taylor has also presented insufficient evidence to suggest that any of the defendants named in this lawsuit ordered his blood drawn. Having failed to satisfy his burden on either of the federal claims, the Court must grant summary judgment on the state law malicious prosecution claim for lack of supplemental jurisdiction. Defendants' Motion for Summary Judgment [106] is therefore granted.

_____
Virginia M. Kendall
United States District Judge

Date: March 18, 2020